UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------- x
                                 :
GAILA AUGUSTA WOODARD      :          3:17 CV 1124 (RMS)
                                 :
V.                                    :
                                 :
NANCY A. BERRYHILL,[1]        :
ACTING COMMISSIONER OF     :
SOCIAL SECURITY            :         DATE: JULY 23, 2018
                                 :
-------------------------------------------------- x

RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER AND ON THE DEFENDANT'S MOTION FOR AN ORDER AFFIRMING
THE DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks review of a final decision by the Commissioner of Social Security ["SSA"] denying the plaintiff Supplemental Security Income benefits ["SSI"].

I.      ADMINISTRATIVE PROCEEDINGS

On or about March 12, 2014, the plaintiff filed an application for SSI benefits claiming that she has been disabled since November 1, 2011, due to anxiety, depression, agoraphobia, bipolar disorder, type II diabetes, hypertension, high cholesterol, limited kidney function, asthma, gastroesophegeal reflux disease, drug addiction, and sleep apnea. (Certified Transcript of Administrative Proceedings, dated August 18, 2017 ["Tr."] 222-30, 247).[2] The plaintiff's

---

[1] On January 21, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security. The Federal Vacancies Reform Act limits the time a position can be filled by an acting official, 5 U.S.C. 3349(b); accordingly, as of November 17, 2017, Nancy Berryhill is serving as the Deputy Commissioner for Operations, performing the duties and functions not reserved to the Commissioner of Social Security.

[2] The plaintiff reported that she received SSI benefits from 2001-2004, until her daughter's father made a fraud complaint, and her benefits were terminated. (See Tr. 118; see also Tr. 57-58, 69-71). On April 28, 2011, an ALJ issued a decision denying the plaintiff's September 4, 2008 application for Disability Insurance Benefits and SSI benefits; in that application, the plaintiff claimed an onset date of April 30, 2008. (See Tr. 96-106).

application was denied initially (Tr. 151-54; *see* Tr. 155-57) and upon reconsideration. (Tr. 163-66). The plaintiff requested a hearing before an Administrative Law Judge ["ALJ"] (*see* Tr. 167-72), and on September 29, 2015, a hearing was held before ALJ Judith M. Stolfo, at which the plaintiff, her case manager, Heidi Novajaski, and a vocational expert, Tamara Prairie, testified. (Tr. 59-95; *see* Tr. 190-211). On November 30, 2015, the ALJ issued an unfavorable decision denying the plaintiff's claim for benefits. (Tr. 8-37). The plaintiff requested review of the hearing decision (Tr. 220), and on May 15, 2017, the Appeals Council denied the plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-5).

On July 7, 2017, the plaintiff filed her complaint in this pending action (Doc. No. 1),[3] and on September 17, 2017, the case was transferred to Magistrate Judge Joan G. Margolis upon consent of the parties. (Doc. No. 17; *see* Doc. Nos. 15-16). On September 29, 2017, the defendant filed her answer and administrative transcript, dated August 18, 2017. (Doc. No. 20; *see* Doc. Nos. 18-19), and on December 20, 2017, the plaintiff filed her Motion to Reverse the Decision of the Commissioner and brief in support (Doc. No. 24), along with the parties' Joint Statement of Material Facts. (Doc. No. 25). On February 6, 2018, the defendant filed her Motion to Affirm and brief in support. (Doc. No. 26). On February 21, 2018, the plaintiff filed her reply brief (Doc. No. 28), and on May 1, 2018, this case was reassigned to this Magistrate Judge. (Doc. No. 29).

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 24) is GRANTED IN PART AND DENIED IN PART such that the case is remanded consistent with this Ruling; defendant's Motion to Affirm (Doc. No. 26) is DENIED IN PART AND GRANTED IN PART.

---

[3] On the same day, the plaintiff filed a Motion for Leave to Proceed *in Forma Pauperis* (Doc. No. 1), which the Court granted. (Doc. No. 8).

II.   <u>STANDARD OF REVIEW</u>

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation omitted); *see also* 42 U.S.C. § 405(g).   Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citation omitted). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. *See Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citation omitted); *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) (citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

III.    <u>DISCUSSION</u>

A.    <u>TESTIMONY AT THE ADMINISTRATIVE HEARING</u>

At the time of her hearing, on September 29, 2015, the plaintiff was forty-eight years old. (*See* Tr. 62).  She had completed the tenth grade and earned her general equivalency diploma in 2002. (Tr. 62).  She lives with her daughter who, at the time of the hearing was seventeen years old.  (Tr. 68). Her daughter also has narcolepsy and receives SSI benefits for Type 1 diabetes.  (Tr. 78).

The plaintiff testified that she experiences "[e]xtreme sleepiness throughout the day[,]" and, when she is "really stressed out," she can get "really, really sleepy to the point [that she cannot] function[.]"  (Tr. 64).  She testified that she used to have hobbies, but she is "so exhausted all the time."  (Tr. 69).    Although she takes Adderall, on "bad days, [she] can sleep all day, all night[,]" even while on Adderall.  (Tr. 64-65).  The plaintiff's daughter does a lot of the cooking and cleaning because the plaintiff can only "work for about five minutes" before she has to stop to rest.   (Tr. 68; *see also* Tr. 270 ("I'm too sleepy to be able to spend a long time cooking."); *see* Tr. 271, 295). Additionally, she has "problems focusing because of the narcolepsy[]"; she cannot stay on task, and she forgets what she is saying in the middle of sentences.  (Tr. 68).  She naps every day, and when she cannot sleep, she cannot concentrate; she is "just in a haze."   (Tr. 73).  According to the plaintiff, when she has a cataplexy[4] attack, which is brought on by stress, it is an "all-day thing[]"; she is "really, really weak[,]" she cannot focus, and she has "total fogginess, total grogginess."  (Tr. 79; *see* Tr. 298 (stress causes cataplexy attacks)).  The plaintiff testified that she drives but is "very careful about making sure that [she is] well rested."  (Tr. 67).  She testified that she "oversleep[s] for appointments[,]" (Tr. 69), and she gets rides to her appointments

---

[4] Cataplexy is defined as "the sudden loss of muscle power following a strong emotional stimulus." *Cataplexy,* MERRIAM-WEBSTER.COM, https://merriam-webster.com/dictionary/cataplexy (last visited July 18, 2018).

or cancels them when she is "too tired." (Tr. 67; *see* Tr. 269 ("I could drive whenever I wanted, now I can't."); *see* Tr. 271 ("I can only drive when I'm rested. I have to plan naps around all appointments due to narcolepsy sleep episodes."), Tr. 295). Additionally, when she has a cataplexy attack, she cancels her appointments or misses them because she cannot function. (Tr. 79).

According to the plaintiff, she has anxiety and depression, for which she has seen a psychiatrist and counselor. (Tr. 67-68). However, according to the plaintiff, because of her "problems . . . with the narcolepsy," she cannot get to her therapy appointments. (Tr. 77). She was "falling asleep in there[,] [and] missing appointments. (Tr. 77). Additionally, the plaintiff testified that she has PTSD, the symptoms of which include "horrible, horrible, horrible nightmares[]" and night terrors "[w]here [she is] screaming out [loud] in [her] sleep[.]" (Tr. 80).

The plaintiff also testified that she cannot work due to back pain (Tr. 65-66), for which she takes Suboxone as a pain management medication. (Tr. 66).[5] The plaintiff testified that she has had three epidurals, including a diagnostic nerve block. (Tr. 67). She can sit for five to ten minutes without pain; she requested to stand while she was testifying. (Tr. 71). According to the plaintiff, she can stand for five or ten minutes before her back gets "extremely stiff[,]" and she can walk for five minutes without pain. (Tr. 71). The plaintiff testified that she is a candidate for back surgery but, at the time of the hearing, she wanted to wait until her daughter finished school. (Tr. 72).

The plaintiff's case manager, Heidi Novajaski, testified that it is "important that the home visits [with the plaintiff are] scheduled either late morning or early afternoon" so that she can get "the most of [the plaintiff] . . . functioning-wise." (Tr. 84; *see* Tr. 82-84). The plaintiff has not

---

[5] The plaintiff also has a history of methamphetamine abuse, which she took to "stay awake[]" (Tr. 70), and she took Suboxone when she was in a rehabilitation program. (Tr. 74). She also took non-prescribed opiates for pain in 2010. (Tr. 75).

slept through an appointment with her, but she has cancelled appointments when she did not sleep, or when she needs to sleep. (Tr. 88). The case manager testified that if the plaintiff is under a lot of stress, she will "get really intense and her speech will go rapid" in a "lot of different directions and then she seems to like blank, like go blank, like she's looking right at you, her eyes are big, but she's blank." (Tr. 84). The case manager will "try[] to reel her back in, bring her back into focus[.]" (Tr. 85). Although she does not doze off while the case manager is talking to her, the plaintiff looks "gone like . . . she's looking right at you, but nothing's happening." (Tr. 88). At times, the plaintiff has told the case manager that she will go right to bed after their meeting because the meeting itself was "too much." (Tr. 86).

## B. THE ALJ'S DECISION

Following the five step evaluation process,[6] the ALJ found that the plaintiff has not engaged in substantial gainful activity since the date of her application. (Tr. 13, citing 20 C.F.R. §416.971 *et seq.*).[7] The ALJ concluded that the plaintiff has the severe impairments of narcolepsy and cataplexy, degenerative disc disease, asthma, diabetes mellitus, depressive disorder, anxiety

---

[6] An ALJ determines disability using a five-step analysis. *See* 20 C.F.R. § 416.920(a). First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. § 416.920(b). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. § 416.920(c). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. §§ 416.920(d), 416.925, 416.926; *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo*, 142 F.3d at 79-80. If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 416.909; *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, she will have to show that she cannot perform her former work. *See* 20 C.F.R. § 416.920(f). If the claimant shows she cannot perform her former work, as the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if she shows she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 416.920(g); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

[7] The plaintiff worked as a customer service representative, packer and shipper, and a school bus driver. (*See* Tr. 16, 63). At her hearing, the vocational expert testified that the plaintiff could not perform her past work (Tr. 91-92), but could do the work of a polisher and an inspector. (Tr. 92-93). According to the expert, however, if the plaintiff was off task twenty percent of the time, she could not perform any work. (Tr. 93).

disorder, agoraphobia, PTSD, and history of poly-substance abuse (Tr. 13-14, citing 20 C.F.R. § 416.920 (c)), but that the plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 14-15, citing 20 C.F.R. §§ 416.920(d), 416.925, and 416.926). In particular, the ALJ concluded that the plaintiff's degenerative disc disease does not meet Listing 1.04 (Tr. 14), the plaintiff's asthma does not meet Listing 3.03 (*id*.), and the plaintiff's mental impairments do not meet Listings 12.04, 12.06 and 12.09. (Tr. 14-15). At step four, the ALJ found that the plaintiff has the residual functional capacity ["RFC"] to perform light work as defined in 20 C.F.R. § 416.967(b), except that she is limited to work involving unskilled tasks and "low stress, defined as involving occasional changes in the work setting[]"; she must also "avoid interaction with the public[,]" and be "limited to work involving no more than occasional interaction with coworkers." (Tr. 15-16 (footnote omitted); *see* Tr. 15-36). The ALJ found that the plaintiff was not capable of performing any past relevant work (Tr. 36, citing 20 C.F.R. § 416.965), but that, considering the plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that the plaintiff could have performed through her date last insured. (Tr. 36-37, citing 20 C.F.R. §§ 416.969 and 416.969(a)). Accordingly, the ALJ concluded that the plaintiff was not under a disability since the date her application was filed. (Tr. 37, citing 20 C.F.R. § 416.920(g)).

C.    THE PLAINTIFF'S CLAIMS ON REVIEW

The plaintiff makes five arguments. First, she contends that the ALJ "committed clear error by failing to consider evidence in the case record that demonstrated that the plaintiff suffered from peripheral neuropathy." (Pl.'s Mem. at 2-4). Next, she claims that the ALJ failed to consider the combined impact of all of the plaintiff's impairments, *i.e.*, her lumbar spine, breathing and

mental impairments, as well as her peripheral neuropathy. (Pl.'s Mem. at 5-7). As part of this argument, she maintains that the ALJ failed to address whether the plaintiff's narcolepsy and cataplexy are at least as medically severe as Listing 11.03, epilepsy-nonconvulsive epilepsy. (Pl.'s Mem. at 8-9). Third, she contends that the ALJ erred in concluding that the plaintiff's lumbar spine impairment does not meet the requirements of Listing 1.04. (Pl.'s Mem. at 10-12). Fourth, she asserts that the ALJ failed to follow the treating physician rule by affording the opinions of Dr. Kenkare and Dr. Nampoothiri "little" weight instead of controlling weight. (Pl.'s Mem. at 13-27). Finally, the plaintiff insists that the ALJ failed to include all of her non-exertional impairments in determining her RFC, including her peripheral neuropathy and Dr. Kenkare's opinion that she would be off task twenty percent of a typical work day and absent about three days each month. (Pl.'s Mem. at 27-28).

The defendant refutes these claims. First, she argues that, not only did the plaintiff fail to allege disability due to peripheral neuropathy on the initial application, the appeal, or during the hearing before the ALJ, the plaintiff's peripheral neuropathy was a residual condition from her diabetes and lasted only one year. (Def.'s Mem. at 7-8). Second, she states that the fact that the ALJ explicitly stated that she considered all of the plaintiff's impairments is sufficient to cover the peripheral neuropathy even if it was not mentioned specifically. (Def.'s Mem. at 9-10). Third, she maintains that the ALJ properly concluded that the plaintiff's impairments did not reach listing level severity. (Def.'s Mem. at 10-14). Fourth, she contends that the ALJ properly assessed the medical opinion evidence. (Def.'s Mem. at 14-20). Finally, she alleges that substantial evidence supports the ALJ's RFC finding. (Def.'s Mem. at 20).

D.     FAILURE TO CONSIDER PLAINTIFF'S PERIPHERAL NEUROPATHY

The plaintiff bears the burden of establishing that she has a medically determinable impairment, which "can be shown by medically acceptable clinical and laboratory diagnostic techniques[]" from an "acceptable medical source."   20 C.F.R. § 416.921.   After a medically determinable impairment is established, the Commissioner determines at step two of the sequential analysis whether the impairment is "severe."  *Id.*; *Greek v. Colvin*, 802 F.3d 370, 373 n.2 (2d Cir. 2015).   In order for an impairment to be "severe[,]" the impairment must "significantly limit [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 416.922. In other words, the impairment must have "more than a minimal effect on an individual's physical or mental ability(ies) to do basic work activities[.]"  Social Security Ruling ["SSR"] 85-28, 1985 WL 56856, at *3 (S.S.A. Jan. 1, 1985).  Moreover, the Social Security Regulations include a "duration requirement[]" – an impairment "must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 416.909.

The underlying medical records reveal that the plaintiff experienced peripheral neuropathy for more than twelve months.  The plaintiff began complaining of "extreme burning in [her] toes" when she was seen at the Community Health & Wellness Center on February 14, 2012. (Tr. 464). Her provider noted that the plaintiff's "[p]eripheral neuropathy [was] acting up[,]" her "[s]tation and [g]ait [were] essentially within normal limits[,]"and a prescription of 300 milligrams of Neurontin was "restart[ed]." (Tr. 466).  At a "diabetes follow-up" two months later, the Neurontin dosage was increased to 300 milligrams, three times a day, and her station and gait remained "essentially within normal limits[.]"  (Tr. 459, 551).

On May 18, 2012 and June 5, 2012, the plaintiff was seen for complaints of "increased burning to [her] lower extremities[,]" and the big toe on her left foot was "hurting more than usual[]"

with slight bluish discoloration." (Tr. 453, 456, 549-50). She was referred to a neurologist and podiatrist. (Tr. 453, 456, 550).

The plaintiff was seen by Dr. Peter Rudzinskiy, a neurologist, on July 5, 2012. (Tr. 412-15). He opined that the plaintiff's diabetic polyneuropathy was "worsening[]"; he prescribed 400 milligrams of Neurontin, three times a day. (Tr. 414).

During the plaintiff's consultative exam with Dr. Wendy A. Underhill three days later, on July 8, 2012, she reported having neuropathy in her feet with "burning and throbbing" as well as a "pinging sensation-line tingling at night" in her legs and arms. (Tr. 416-19). According to the plaintiff, she "stopped working due to neuropathy affecting her feet and difficulty standing." (Tr. 418). Dr. Underhill noted "no evidence of disturbance in gait, posture, or motor movements." (Tr. 416).

Eight months later, on March 15, 2013, the plaintiff was seen by her APRN, Devon Kwassman, for a "[f]ollow up [for] [d]iabetes[.]" (Tr. 528-29, 558-59). The plaintiff had "[p]ain and/or tingling of feet"; Kwassman noted that the plaintiff's neuropathy was "worsening, [and it] ha[d] moved into [her] arms and hands." (Tr. 529, 559). A month later, on April 10, 2013, the plaintiff reported to Dr. Daniel Kordansky, a consultative examiner for Disability Determination Services, that she had "a pins and needle sensation" in her legs, arms and feet which is related to her diabetes. (Tr. 517; *see* Tr. 517-19). On examination, Dr. Kordansky noted complete range of motion in the plaintiff's upper and lower extremities and normal muscle tone and strength in her upper and lower extremities. (Tr. 518). On July 22, 2013, Kwassman noted that the plaintiff had numbness in her hands and feet, and upon examination, there was a "positive Phelan's sign" over the median nerve of her wrists bilaterally. (Tr. 540, 571).

Although the ALJ's decision is relatively thorough, including a comprehensive medical history, the ALJ did not consider the plaintiff's peripheral neuropathy in her decision. The defendant correctly notes that it would be harmless error for an ALJ to proceed past step two without referencing an alleged impairment if the ALJ considered the effects of all of a claimant's impairments through the subsequent steps. (Def.'s Mem. at 8); *Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (summary order). In this case, however, the ALJ did not "specifically consider[]" this impairment in the subsequent steps. *See Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (finding harmless error when conditions are considered during subsequent steps). "[T]he harmless error analysis . . . does not depend only on whether the ALJ continued beyond step two, but also on whether the ALJ nonetheless considered in subsequent steps the conditions [she] failed to discuss in step two." *Hernandez v. Berryhill*, No. 3:17 CV 368(SRU), 2018 WL 1532609, at *11 (D. Conn. Mar. 29, 2018) (citations omitted).

In *Hernandez*, the plaintiff did not list kidney stones in her application for disability. *See id.*, 2018 WL 15326909, at *2. Moreover, in his analysis, the ALJ in that case did not to consider the plaintiff's "kidney stones[,]" and in doing so, failed to determine the "severity of [that] impairment and its impact on [the plaintiff's] physical and mental ability to perform basic work activities." *Id.* at *11. United States District Judge Stefan R. Underhill noted as follows:

> Here, the ALJ did not consider Hernandez's kidney stones in any meaningful way in his analysis at subsequent steps and in determining her residual functional capacity. In determining Hernandez's residual functional capacity, the ALJ lays out a relatively comprehensive history of her medical treatment. Although he notes one procedure for her kidney stones, . . . he omits the condition in the remainder of his analysis.

*Id.* at *12.

This case draws striking similarities to *Hernandez*. In this case, the plaintiff did not list peripheral neuropathy as a disabling condition in her application for benefits. (*See* Tr. 247).

Moreover, just as in *Hernandez*, the ALJ in this case laid out a "relatively comprehensive history of [the plaintiff's] medical history[,]" *id.* at *2, yet failed to reference any of the medical records relating to peripheral neuropathy, as discussed above. The ALJ noted that "a review of the medical evidence of record confirmed a history of diabetes mellitus[,]" but continued, "the claimant's treatment history is inconsistent with an inability to perform any full time work due to diabetes mellitus." (Tr. 23). The ALJ then recited the history of the plaintiff's glucose levels and blood sugar, along with her diet; yet, there is no reference to peripheral neuropathy. (Tr. 23-24). Accordingly, the ALJ's failure to consider the plaintiff's peripheral neuropathy at step two, and her failure to incorporate this condition in her analysis of the remaining steps of the sequential analysis, is, indeed, harmful error.

      E.      <u>FAILURE TO CONSIDER PLAINTIFF'S NARCOLEPSY AND CATAPLEXY, IN COMBINATION WITH OTHER IMPAIRMENTS, AND MISAPPLICATION OF THE TREATING PHYSICIAN RULE</u>

The plaintiff also argues that the ALJ's failure to consider the effects of the plaintiff's narcolepsy and cataplexy constitutes error as "the record is replete with medical evidence suggesting that the plaintiff's narcolepsy and cataplexy, in combination with her other impairments, equals a listing.[8] (Pl.'s Mem. at 8). Additionally, the plaintiff asserts that the medical evidence of record is consistent with Dr. Kenkare's medical opinion; accordingly, the plaintiff asserts that the ALJ erred in failing to give Dr. Kenkare's opinion controlling weight. (Pl.'s Mem. at 14; *see* Pl.'s Mem. at 14-21).

In her decision, the ALJ noted the "[t]reatment records revealed that the claimant suffered from narcolepsy and cataplexy and she experienced daytime sleepiness, which necessitated the use of medications[.]" (Tr. 22). However, as discussed further below, the ALJ did not address whether

_____

[8] *See* note 9 *infra*.

these impairments reached listing level severity, and she accorded "little weight" to Dr. Kenkare's opinion that the plaintiff's narcolepsy and cataplexy met listing level severity. (Tr. 36).

The plaintiff began treatment for excessive daytime exhaustion with APRN Kwassman on June 21, 2013. (Tr. 536-38, 566-69). Two weeks later, a polysomnography report, dated July 7, 2013, demonstrated mild obstructive sleep apnea. (Tr. 814-15). A second polysomnography report, dated August 8, 2013, also demonstrated obstructive sleep apnea. (Tr. 604, 802-03).

On January 9, 2014, the plaintiff was seen by Dr. Natalya Thorevska for nightmares, night terrors, difficulty maintaining sleep, and severe excessive daytime sleepiness. (Tr. 792-98). As the ALJ noted, a polysomnography report, dated February 16, 2014, demonstrated mild obstructive sleep apnea consistent with narcolepsy. (Tr. 22, 773, 778).

On March 18, 2014, Dr. Jeffrey Nascimento assessed the plaintiff as suffering from obstructive sleep apnea, narcolepsy and extreme fatigue, for which he prescribed Provigil. (Tr. 746-48, 753-755). A month later, on April 10, 2014, the plaintiff reported to Dr. Patrick Troy that neither the Provigil nor CPAP had made a difference; the plaintiff was assessed as having obstructive sleep apnea, narcolepsy, and extreme fatigue, multifactorial in etiology. (Tr. 743-44). The plaintiff underwent a consultation with Dr. Francois Roux on May 21, 2014 at The Charlotte Hungerford Hospital, as a follow up to the diagnoses of obstructive sleep apnea and narcolepsy. (Tr. 732-36, 738-42). Dr. Roux noted that the plaintiff had to stop using Provigil because she felt "extremely anxious[]"; she was not able to tolerate it. (Tr. 733, 739). Dr. Roux was "reluctant" to start methylphenidate due to her history of methamphetamine abuse. (Tr. 735,741).

As the ALJ referenced in her decision, on June 16, 2014, the plaintiff reported that she had not started her prescription of Xyrem for narcolepsy because she was concerned about the side effects, and that she has not been snoring since she raised the head of her bed. (Tr. 22; *see* Tr.

715).  The ALJ also noted that the plaintiff was seen by Dr. Natalya Thorevska the next day; Dr. Thorevska agreed that the plaintiff should start Xyrem, and that the plaintiff was not able to use a CPAP.  (Tr. 728-30).   Dr. Thorevska's impression was that the plaintiff suffered from narcolepsy with possible cataplexy variant, obstructive sleep apnea syndrome with REM sleep-related worsening of sleep-disordered breathing and CPAP intolerance; night terror and nightmare disorder; excessive daytime sleepiness and fatigue; bipolar disorder with poorly controlled anxiety; and chronic insomnia.  (Tr. 730).

On July 17, 2014, the plaintiff reported to Dr. Nascimento that Xyrem caused profound symptoms of anxiety and that her treatment for narcolepsy "failed."  (Tr. 726).  Dr. Nascimento started the plaintiff on Ritalin.  (Tr. 727).  As of August 13, 2014, the plaintiff reported that she had not noticed a change in her narcolepsy symptoms since starting Ritalin.  (Tr. 718).  On August 28, 2014, Dr. Roux noted that the plaintiff still had residual daytime hypersomnia despite being on Ritalin, but that since she started on Prozac, she had "not noticed any further episode of cataplexy."  (Tr. 723-25).  The plaintiff was seen for a follow-up for her obstructive sleep apnea and narcolepsy with cataplexy on September 23, 2014, at which time she was still taking Prozac for her cataplexy; Dr. Edward Salerno increased her dosage of Prozac and Ritalin and noted that the plaintiff is "unable to work[]" and is unable to drive.  (Tr. 960; *see* Tr. 959-61).

On October 5, 2014, the plaintiff underwent another polysomnography which showed periodic limb movement disorder with periodic limb movement of sleep. (Tr. 947-52).  A month later, on November 11, 2014, Dr. Roux switched the plaintiff's prescription from Ritalin to Adderall and told her she should not drive due to her significant hypersomnia.  (Tr. 941-44).

The plaintiff returned to Dr. Troy on December 11, 2014 for frequent periods of profound fatigue, despite uninterrupted sleep from 9:00 p.m. to 6:00 a.m.  (Tr. 929-31).  Dr. Troy noted that

the plaintiff "seem[ed] to have done better after a transition to Adderall[,]" which prescription he increased. (Tr. 930).

On January 21, 2015, Dr. Thorevska noted that the plaintiff was going to bed around 9:00 p.m., waking briefly during the night and was rising at 6:30 a.m. (Tr. 924). Dr. Thorevska opined that the plaintiff had narcolepsy with cataplexy with "significant residual hypersomnia despite being on [a] maximum dose of Adderall, as well as episode[s] of cataplexy despite being on Prozac." (Tr. 926; *see* Tr. 924-27).

The plaintiff was seen by Dr. Jay D. Kenkare on February 13, 2015 for a follow up for narcolepsy with cataplexy. (Tr. 921-23). Dr. Kenkare noted that the plaintiff was sleeping from 8:30 p.m. to 6:15 a.m., her sleep was "highly fragmented[,]" and she tried to nap once or twice a day. (Tr. 921). She experienced cataplexy "approximately twice a week[]" typically with "drooping eyelids[,]" and "[g]iven her excessive daytime sleepiness," Dr. Kenkare advised the plaintiff to avoid driving. (Tr. 923).

In addition to referencing some of the foregoing records in her decision, the ALJ noted treatment records from Dr. William A. Handleman, a nephrologist who treated the plaintiff for kidney disease (*see* generally Tr. 639-659); the ALJ recited Dr. Handleman's opinion that the plaintiff's daytime drowsiness "was more a complication of her sleep apnea than her narcolepsy[,]" as the "major symptoms of her narcolepsy were night terrors, which appeared to be triggered by taking Rozerem[.]" (Tr. 22; *see* Tr. 643). Rather than needing to rely on the nephrologist's assessment of the plaintiff's narcolepsy, the ALJ had the benefit of a Sleep Disorder Medical Source Statement from Dr. Kenkare, who, at the time he completed the Statement on January 21, 2015, had been treating the plaintiff for approximately two years for narcolepsy with cataplexy and obstructive sleep apnea. (Tr. 977-80).

Dr. Kenkare opined that the plaintiff suffers from recurrent daytime sleep attacks, which occur twice a week, "suddenly and in hazardous conditions[.]" (Tr. 977). He opined that the plaintiff's prognosis is "[f]air" and that the attacks may be precipitated by quiet, sleep disturbance, exertion or stress. (Tr. 977). Additionally, the plaintiff's condition has been identified through positive clinical findings and test results, namely positive Multiple Sleep Latency Test and Polysomnography. (Tr. 978). Dr. Kenkare opined that the plaintiff could sit for a maximum of thirty minutes before she may fall asleep; she would need scheduled naps once a day for thirty minutes, and she would be "off task" twenty percent of the work day. (Tr. 978-79). According to Dr. Kenkare, the plaintiff cannot drive or be exposed to heights, moving machinery, or power tools, and she is capable of "low stress work" but would have "good days" and "bad days[.]" (Tr. 979). Dr. Kenkare opined that the plaintiff would be absent about three days each month. (Tr. 979).

Additionally, when asked if the plaintiff's sleep disorder is "at least as medically severe" as Listing 11.03, "Epilepsy -- nonconclusive epilepsy[,]" which is defined as "occurring more frequently than once weekly in spite of at least [three] months of prescribed treatment[,]" with "alteration of awareness or loss of consciousness . . . or significant interference with activity during the day[,]" Dr. Kenkare responded, "[y]es[.]" (Tr. 980).[9] The ALJ, however, accorded this

---

[9] The regulations provide that, if a claimant has an impairment "that is not described in the Listing of Impairments in [A]ppendix 1 of [S]ubpart P of [P]art 404[, the Commissioner] will compare [a claimant's] findings with those for closely analogous listed impairments." 20 C.F.R. § 416.926(b)(2). If the findings "related to [a claimant's] impairment(s) are at least of equal medical significance to those of a listed impairment, [the Commissioner] will find that [the claimant's] impairment(s) is medically equivalent to the analogous listing." *Id.* Narcolepsy and cataplexy, sleep disorders, are assessed as "at least as medically severe" as Listing § 11.03 Epilepsy -- non-convulsive epilepsy. (Tr. 980) (emphasis omitted). On the date of the plaintiff's hearing, epilepsy was contained in Listing § 11.03, but the neurological listings were changed effective September 29, 2016, and epilepsy is now found in Listing § 11.02. 81 Fed. Reg. 43048 (July 1, 2016). Listing § 11.03 reads as follows: "Epilepsy – nonconvulsive epilepsy (petit mal, psychomotor, or focal) . . . occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness of loss of consciousness and transient postical manifestations of unconventional behavior or significant interference with activity during the day." 20 C.F.R. Part 404, Subpt. P, App'x 1, 11.03.

assessment "little weight[,]" concluding that "it is inconsistent with limited supportive clinical findings" as "the claimant reported going to bed around 9:00 p.m., sleep onset latency within minutes, no snoring, some somniloquy, no gasping or choking, and waking briefly during the night with a final rising time of 6:30 a.m." (Tr. 36).

The treating physician rule requires that "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess,* 537 F.3d at 128, (quoting 20 C.F.R. § 404.1527(d)(2) [now (c)(2)]).

In this case, as discussed above, there are multiple treatment records in which the plaintiff reported that she slept from 9:00 p.m. to 6:30 a.m., but still experienced excessive daytime sleepiness and cataplexy, and her treating doctors repeatedly diagnosed her with both narcolepsy and cataplexy with knowledge of her sleep schedule. The records reflect that the "daytime hypersomnia" (even when the record also reflects a sleep history of going to bed at 9:00 and 10:00 p.m, and waking at 6:30 a.m.) was a symptom of narcolepsy. (Tr. 733, 739 (despite consistent nighttime sleep schedule, plaintiff still "feels tired with significant hypersomnia[]";"[a]s far as nacolepsy, she is still having significant daytime hypersomnia"); *see* Tr. 723 (the plaintiff's bedtime is 9:00 p.m.; she wakes multiple times, arises at 6:30 a.m., feels "un-refreshed and groggy[,]" naps for two hours; "[w]hen she feels emotional, she reports some weakness in her arm and sometimes has some symptoms of cataplexy in the form of arm weakness and jaw dropping[]")). These diagnoses were also confirmed by objective medical testing, which Dr. Kenkare referenced in his Medical Source Statement. (*See* Tr. 729 (the multiple sleep latency test on February 17, 2014 was "consistent with diagnosis of narcolepsy[]"). Yet, in spite of the medical

evidence of record, the ALJ stated: "I cannot just blindly accept the opinion of a doctor (even a long treating one) without a certain amount of objective evidence that supports their conclusions." (Tr. 21).

Additionally, contrary to the ALJ's conclusion, the underlying treatment records reveal that the plaintiff's narcolepsy and cataplexy did not improve with the use of medications. (*See* Tr. 36; *see, e.g.*, Tr. 726 (severe panic attacks with Xyrem, "therefore, the treatment for her narcolepsy failed."); Tr. 926 ("She has narcolepsy with cataplexy and has significant hypersomnia despite being on maximum dose of Adderall, as well as episode of cataplexy, despite being on Prozac")). Moreover, the records reveal that the plaintiff experienced significant side effects and counter indications from her medications. (Tr. 726 (profound anxiety attack the first time she took Xyrem); Tr. 728 (she did not tolerate Provigil due to "severe anxiety and mood destabilization[]"); Tr. 730 ("discussed an option of adding a stimulant like Ritalin after a trial of Xyrem in presence of persistent significant excessive daytime sleepiness, which interferes with driving[]"; "discussed safety concerns" with taking Xyrem); Tr. 732 (when taking 200 milligrams of Provigil, she "felt not very much improved," and increase in Provigil caused her to feel "extremely anxious"); Tr. 739 ("not able to tolerate" Provigil); Tr. 924 (treated with Ritalin "but felt some residual hypersomnia[]"; cataplexy has not been well controlled "even on Prozac" and because of history of substance abuse, "she is not a candidate for Xyrem[]")). The ALJ's characterization of the medical evidence and her analysis reflects "a substitut[ion] of [her] own judgment for competent medical opinion[.]" *Balsamo v. Chater*, 142 F.3d 75, 81 (2d. Cir 1998) (internal quotations and citations omitted). The Second Circuit has made it abundantly clear that an "ALJ cannot arbitrarily substitute [her] own judgment for competent medical opinion[,]" nor can an ALJ "set [her] own expertise against that of a physician who [submitted an opinion.]" *Id.*

The ALJ's interpretation of the medical evidence relating to the plaintiff's narcolepsy and cataplexy is inconsistent with the medical opinion of the plaintiff's treating provider who specializes in these sleep disorders, and whose opinion is supported by objective medical testing, and is consistent with the treatment records.[10] Upon remand, the ALJ shall consider the plaintiff's

[10] The plaintiff also contends that the ALJ failed to apply properly the treating physician rule with regard to the opinions of Dr. Sreedevi Nampoothiri. (Pl.'s Mem. at 21-27). On June 5, 2014, Carol Genova, R.N., completed a questionnaire for Disability Determination Services which was co-signed by Dr. Nampoothiri. (Tr. 661-64). In that questionnaire, Ms. Genova states that the plaintiff was irritable, depressed, unfocused and hopeless and that she was the survivor of severe trauma. (Tr. 661). Her memory, attention and concentration were fair; her speech was pressured and rapid; she had auditory and visual hallucinations, possible secondary to narcolepsy; her mood was depressed, anxious, and fluctuated; and her insight and judgment were fair. (Tr. 661-64). In the second Mental Impairment Questionnaire, dated September 18, 2014, also co-signed by Dr. Nampoothiri, Ms. Genova stated that the plaintiff's substance abuse was in remission; she suffered from bipolar disorder with an onset thirteen years prior; she had night terrors with trouble focusing and increased emotional upset at times; she had auditory and visual hallucinations; she had a history of severe trauma with frequent exacerbations; she felt hopeless at times and overwhelmed; she was continuing with medication adjustments from the sleep center; she was experiencing cataplexy attacks with major weakness in her hands, arms and neck and droopy eyelids; and that she had been instructed to take multiple naps a day, and that she could not pay a driver. (Tr. 849). Additionally, the plaintiff's speech was pressured at times; her mood fluctuated; she had anxiety; and, her memory, attention and concentration were fair and declined when she was overwhelmed. (Tr. 850).

"[O]nly 'acceptable medical sources' can be considered treating sources . . . whose medical opinions may be entitled to controlling weight." Social Security Ruling 06–3p, 2006 WL 2329939, at *2 (S.S.A. Aug. 6, 2006). "Acceptable medical sources" are further defined (by regulation) as licensed physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 416.913(a). The opinions of registered nurses "may be considered with respect to the severity of the claimant's impairment and ability to work, but need not be assigned controlling weight." *Genier v. Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008) (summary order), *citing* 20 C.F.R. § 416.913(d)(1). In this case, the ALJ explained that she assigned "little weight" to Ms. Genova's opinion as her "assessment is inconsistent with the documentary evidence of record and the medical evidence of record, . . . including . . . the results of mental status examinations[,]" Global Assessment Functioning ["GAF"] scores, and there was no evidence of psychiatric hospitalizations. (Tr. 35). *See* SSR 06-3p, 2006 WL 2329939, at *3 (the ALJ shall consider the consistency of the opinion with the record of the whole); (*see also* Tr. 673, 859-60, 866-67, 870-71, 874-75, 898, 901, 983, 989, 1000, 1013, 1025 (normal thought process, fair insight and judgment, no evidence of psychosis)). The underlying medical records reveal that the plaintiff was treated by several providers at Behavioral Health at Waterbury Hospital (*see generally* Tr. 621-982-1074), including by Dr. Nampoothiri on November 11 and December 19, 2014 for opiate dependence, mood disorder and sleep disorder (Tr. 983-84), for medication management on April 3 and 29, 2014 (Tr. 621, 637-38), on February 3, 2015 (Tr. 995-98, 1001-02), and on March 31, 2015 (Tr. 1010-11, 1014-15), and by Ms. Genova for individualized therapy. (Tr. 30). In her decision, the ALJ discussed Dr. Nampoothiri's February and March 2015 notes in which it was noted that the plaintiff had fluent speech, anxious mood and affect, clear thought process, and fair insight and judgment; on those occasions, as the ALJ noted, Dr. Nampoothiri assessed with GAF scores of 60 and 62, respectively. (Tr. 30, 32; *see* Tr. 995, 1001, 1010, 1014). In her decision, the ALJ appropriately noted that Dr. Nampoothiri "signed off" on the forms completed by Ms. Genova, but assigned Ms. Genova's opinion "little weight" as she is not an "acceptable medical source" and her assessments were "inconsistent with the documentary evidence of record and the medical evidence of record[.]" (Tr. 35); *see Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) (ALJ must set forth good reasons for the weight assigned to medical opinions). In light of the underlying treatment records, as discussed above and below, and the reasons explained by the ALJ, the Court concludes that the ALJ did not err if assigning "little weight" to these opinions.

narcolepsy and cataplexy, determine if these conditions are "at least as medically severe" as a listed impairment, and weigh Dr. Kenkare's medical opinion in light of the complete medical record and objective medical testing.

Additionally, although the ALJ recited the familiar language that she considered "[t]he severity of the claimant's . . . impairments, considered singly and in combination[,]" (Tr. 14), the ALJ's failure to address the combination of the plaintiff's narcolepsy and cataplexy with her mental impairments constitutes error as the record supports a connection with these impairments.[11] *See Pratt v. Astrue*, No. 3:10 CV 413(CFD), 2011 WL 322823, at *12 (D. Conn. Jan. 28, 2011); *see also Burgin v. Astrue*, 348 F. App'x 646, 647 (2d Cir. 2009) (summary order) ("[T]he combined effect of a claimant's impairments must be considered in determining disability; the [Commissioner] must evaluate their combined impact on a claimant's ability to work, regardless

---

[11] In her decision, the ALJ discussed the extensive treatment notes from Jean D. Irish, Ph.D., of Community Health Affiliates, who regularly treated the plaintiff for opioid dependence, alcohol dependence, in remission, panic disorder, anxiety and depression. (Tr. 33-34); *see* Tr. 678-99, 859-99). The ALJ noted that Dr. Irish's "observations regarding the claimant's mental status and functional limitations resulting from her mental impairments were consistent with the medical evidence of record[,]" and the ALJ incorporated the related mental limitations in her RFC. However, the ALJ assigned "partial weight" to Dr. Irish's opinion to the extent that Dr. Irish opined that the plaintiff's narcolepsy resulted in "marked" limitations in behavioral function (Tr. 34; *see* Tr. 853-57); the ALJ concluded that Dr. Irish did not treat the plaintiff for narcolepsy, and that the plaintiff's narcolepsy symptoms improved with the use of medications. (Tr. 34). But Dr. Irish's treatment notes reference the effect of the plaintiff's narcolepsy and cataplexy on her ability to function with anxiety, low energy, and loss of interest in activities. (*See* Tr. 682, 890-91; *see also* Tr. 924 (Dr. Thorevska's notes: has bipolar disorder with depression and anxiety and has been treated on Prozac, and "has some cataplexy, which has been not well controlled even on Prozac[]"); *see also* Tr. 857 (Dr. Irish noted the effect of the plaintiff's fatigue on her "[t]ask [p]erformance[.]")). Additionally, as set forth in the second Mental Impairment Questionnaire, dated September 18, 2014, co-signed by Dr. Nampoothiri, Ms. Genova noted the coordination of care between the plaintiff's mental health treatment and her treatment for narcolepsy and cataplexy. (Tr. 849 (Dr. Nampoothiri "continues to consult with [the] sleep center frequently" regarding the frequent medication adjustments for the plaintiff's narcolepsy and cataplexy.)).

The plaintiff also argues that the ALJ erred in limiting her discussion to the plaintiff's lumbar spine impairment, her breathing impairment, and her mental impairment, and she reviewed each in isolation, not in combination. (Pl.'s Mem. at 7). In her decision, the ALJ discussed each of these impairments before concluding that the signs and symptoms of each did not meet Listings 1.04, 3.03, or 12.04, 12.06 and 12.09. (Tr. 14-15). The plaintiff does not cite anything in the record to establish a relationship between these impairments, nor does she argue "how such a relationship could be inferred in this case." *Francis v. Astrue*, Civ. No. 3:09 CV 1826(VLB), 2011 WL 344087, at *3 (D. Conn. Feb. 1, 2011). Additionally, in her discussion underlying her RFC finding, the ALJ considered evidence of how these impairments in combination affected the plaintiff. *See Duprey v. Berryhill*, No. 3:17 CV 607(SALM), 2018 WL 1871451, at *13 (D. Conn. Apr. 19, 2018). Accordingly, any error by the ALJ as to her alleged failure to articulate her consideration of these impairments is harmless.

of whether every impairment is severe.").  Accordingly, when the ALJ reassesses the plaintiff's impairments, as discussed here and in Section III.D. *supra*, the ALJ must specifically consider the combined effect of the plaintiff's impairments upon her ability to work, and reweigh the treating physician's opinion, consistent with the treating physician rule.

F.    DETERMINATON AS TO LISTING 1.04

The plaintiff contends that the ALJ erred in her assessment of her lumbar spine impairment, which the plaintiff argues meets the criteria of Listing 1.04.  (Pl.'s Mem. at 9-12).  "'For a claimant to show that [her] impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.'" *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (citations and footnote omitted) (emphasis in original).

To satisfy Listing 1.04A, a claimant must establish "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness of muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]" 20 C.F.R. Part 404, Subpt. P, App'x 1, 1.04A.  To satisfy Listing 1.04C, a claimant must establish "[l]umbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b." *Id.*, 1.04C.

The plaintiff has a history of scoliosis and lumbar stenosis for which she has been treated with pain management.  (Tr. 65, 441).  On November 15, 2013 and January 17, 2014, Dr. Subramani Seetharama, a board certified physical Medicine & Rehabilitation Specialist, noted a loss of the normal spinal lordosis, mild scoliosis in the lumbar spine to the left, tenderness of the

left and right paraspinal, bilateral muscle spasms and restricted and painful left and right flexion and extension and induration of the left renal angle. (Tr. 615-20). The plaintiff had a negative straight leg raise test. (Tr. 616). On January 17, 2014, Dr. Seetharama administered a left paraspinal trigger point injection. (Tr. 616). Ten months later, on October 2, 2014, Dr. Seetharama noted that the injection had not provided significant relief, yet the plaintiff had "painless" extension and flexion of the lumbar spine; he gave her a second trigger point injection. (Tr. 1076-77). Additionally, upon examination, the plaintiff again had a negative straight leg raise test. (Tr. 1077). On November 18, 2014, Dr. Seetharama administered a third left paraspinal trigger point injection. (Tr. 1079-81). Two weeks later, the plaintiff's primary care APRN, Devon Kwassman, noted that the plaintiff had not received relief from any of the conservative measures. (Tr. 915).

A CT scan performed on December 2, 2014 revealed changes related to "prior extensive thoracolumbar fusion for scoliosis[]"; "[s]uperimposed degenerative changes" at L4-L5 "where they lead to moderate-to-severe canal stenosis, at least moderate narrowing of the right neural foramen and severe narrowing of the left neural foramen with potential mass effect on both existing L4 nerve roots[]"; and "[m]ultifactorial degenerative changes at L5-S1" which "lead to potential mass effect on the exiting left L5 nerve root." (Tr. 908; *see also* Tr. 907).

On January 5, 2015, Dr. Joel A. Bauman, a neurosurgeon, noted that the plaintiff had low back pain radiating into her right thigh, "subjective weakness" that feels "as if the leg gives out when she climbs stairs[]" and spasmodic pain. (Tr. 904-05). Dr. Bauman noted full range of motion in the plaintiff's cervical spine, and decreased lordosis and scoliosis, with restricted flexion and extension in the lumbar spine. (Tr. 906). He also found full strength in both lower extremities, a normal gait and balance, and grossly intact sensation. (Tr. 906). Similarly, in March and July 2015, Dr. Bauman found full strength of both lower extremities, intact sensation, and normal

balance and gait. (Tr. 911, 966).[12] Thus, despite the plaintiff's arguments to the contrary, the medical evidence does not establish that the plaintiff's spinal impairment meets Listing 1.04A.

Additionally, the record fails to establish an inability to ambulate effectively, as required to meet Listing 1.04C.[13] On July 2, 2015, Dr. Bauman noted restricted and painful flexion and extension, along with sensation that was not intact. (Tr. 964, 966). The plaintiff reported that "[a]t times[,] she ha[d]difficulty walking but [there were no] reports . . . [of] falls." (Tr. 964). Dr. Bauman noted that the plaintiff had a normal gait and normal balance. (Tr. 966). This assessment is consistent with the October 2014 record of the plaintiff's normal gait and station (Tr. 1077), as well as January and February 2015 records of normal gait and balance. (Tr. 906, 911). Additionally, although the record reflects some difficulty walking (*see* Tr. 1078), the plaintiff reported that she did not use an assistive device. (Tr. 274). Accordingly, the ALJ did not err in concluding that the plaintiff's lumbar spine impairment did not meet the criteria of Listing 1.04.

IV.   CONCLUSION

Accordingly, for the reasons stated above, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 24) is GRANTED IN PART AND DENIED IN PART, and the

---

[12] On February 10 and June 4, 2015, the plaintiff received transforaminal steroid injections. (Tr. 913, 967-70).

[13] Under Listing 1.00B2b, an inability to ambulate effectively means:

> an extreme limitation of the ability to walk; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R. Part 404, Subpt. P, App'x 1, 100.B2b.

defendant's Motion to Affirm (Doc. No. 26) is DENIED IN PART AND GRANTED IN PART

such that this case is remanded for the reasons stated in this Ruling.[14]

Dated this 23rd day of July, 2018 at New Haven, Connecticut.

 /s/Robert M. Spector, USMJ
Robert M. Spector
United States Magistrate Judge

---

[14] In light of the conclusions reached in Section III. D, E and F, *supra*, the Court need not address the plaintiff's arguments regarding the ALJ's RFC findings.  Upon remand, a new RFC finding will be made, if appropriate, in light of the conclusions reached by the ALJ.